UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VINCE SAITTA, | ) |
|          Plaintiff, | ) |
| v. | ) No. 08 C 5018 |
| MELODY RAE MOTORS, INC., d/b/a HONDA ON GRAND, | ) Judge Rebecca R. Pallmeyer |
|          Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Vince Saitta, a Sicilian-American, worked as a car salesman for Melody Rae Motors for nearly 18 months before his termination in September 2008. In this lawsuit, brought under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, Saitta alleges that Defendant subjected him to a hostile work environment due to his national origin and retaliated against him because of his complaints of discrimination. Defendant has moved for summary judgment on all claims, and for the reasons that follow, that motion is granted in part and denied in part.

## FACTUAL BACKGROUND

Honda on Grand, the business name that Melody Rae Motors uses for its Elmhurst, Illinois Honda dealership, initially hired Saitta in 2002, but he left after two weeks because he broke his leg and could not work for more than a year. (Def's 56.1 ¶ 5; Pl's 56.1, Ex. A, at 138-39, 174-75.) Five years later, in March 2007, Honda on Grand hired Saitta again after he interviewed with four managers, Richard Walker, David Salomon, Ray Abdi, and Gene Khytin. (Def's 56.1 ¶ 7-8.) At Honda on Grand, Saitta's superiors included Michael Perrin, the owner of the dealership; John Ridings, the general manager; and Abdi, a new car manager. (Pl's 56.1 ¶ 1.) Although Perrin was only on the premises about once a month, he talked with Ridings by phone nearly every day. (*Id.*)

A.  **Alleged Harassment**

Saitta claims he was regularly subjected to harassment on the basis of his national origin. (Pl's 56.1 ¶ 14.) Among other insults, managers and coworkers called Saitta a "wop," a "greaseball," and a "Sicilian dirtbag." (*Id.*; Pl's Resp. to Def's 56.1 ¶ 42.) Saitta testified that the insults were a daily occurrence and he identified a few specific incidents. (Pl's 56.1, Ex. A, at 223-29, 275, 278, 369.) Saitta acknowledges that he also engaged in some back-and-forth with his coworkers that included insults and graphic language, but he stated that the only time he made an insulting comment that touched on a coworker's race or ethnicity was in a conversation with Paul Balice, who, like Saitta, is an Italian-American. (Def's 56.1 ¶ 51; Pl's Resp. to Def's 56.1 ¶ 51.) Balice's family came from Bari, Italy, and, according to Saitta, Saitta merely made light of the regional differences between Sicily and Bari, in particular, the distinctive accent of Bari natives. (Pl's Resp. to Def's 56.1 ¶ 51.)

Saitta never complained in writing about his treatment before the 70-cents incident, discussed below, but he testified that he made several verbal complaints without success. (*Id.* ¶ 74.) Although Saitta said he reported the harassment "many, many times" and "a few times a month," (Pl's 56.1, Ex. A, at 234-36), he could only remember the specifics of a handful of meetings with supervisors about his coworker's harassing comments. (*Id.* at 276.)

C.  **The 70-Cents Incident**

On August 19, 2008, Saitta was assigned a "bone deal." (Def's 56.1 ¶ 59.) A "bone deal" is a sale where the deal has already been made before a salesperson is assigned. (*Id.*) Saitta's role in the deal required little more than taking the customer's trade-in vehicle and providing the customer with a new car. According to Saitta, his manager and the customer were rushing him to complete the transaction, so he drove the trade-in to the area where the new car was being prepared rather than to the location where he would normally take a trade-in vehicle. (Pl's 56.1 ¶ 28; Def's 56.1 ¶ 63.) While Saitta waited for the new car to be ready for the customer, he cleaned

out the trade-in, finding some papers, stickers, and 70 cents, which he put in his pocket in order to return to the customer. (Pl's 56.1 ¶ 30.) Ridings, the general manager, and Abdi, a new car manager, observed Saitta's efforts. (Def's 56.1 ¶ 65.) They approached Saitta, and Ridings asked him whether he had taken anything he was not supposed to take. (Pl's 56.1 ¶ 31.) Saitta did not know what Ridings meant, so Ridings asked Saitta specifically whether he had taken something out of the car's change compartment. (*Id.*) Saitta answered by removing the change from his pocket and asking whether that was what Ridings was talking about. He also asked Ridings, referring to the outside business responsible for detailing trade-in cars, "are you mad because I didn't leave it in there for Scotty to take it?" (*Id.*; Def's 56.1 ¶ 68.) The conversation escalated until Ridings told Saitta to "shut the fuck up before I launch you, get the fuck out of my face." (Pl's 56.1 ¶ 32.) Defendant does not substantially dispute Saitta's account of the incident except to allege that Ridings and Abdi reasonably believed that they had witnessed Saitta stealing a customer's property. (Def's 56.1 ¶ 66.) According to Defendant, after Ridings witnessed what he believed was unusual behavior by Saitta—Saitta says it was not unusual—he waited fifteen minutes to see if Saitta would return the change to the customer. (*Id.* ¶ 65-66.)

After his argument with Ridings and Abdi, Saitta completed the deal with the customer and returned the change. (Pl's Resp. to Def's 56.1 ¶ 66.) Ridings testified that he never questioned the customer about the change and that the customer never complained to him. (Pl's 56.1 ¶ 36.)

**D.    Saitta's Termination**

After Saitta left work on August 19, 2008, he sent an e-mail to Ridings and two other managers, complaining about harassment and discrimination he had suffered while employed by Defendant:

> Note from Saitta, Vincent: Attention Chuck Perrin, John Ridings, and Mike Andrews,
>
> This is a formal letter to the three principles of Honda on Grand and that being the Vice President, General Manager and Comptroller for which i know to be the principles of this dealer i am currently employed at. I am officially filing a lawsuit

3

> against Honda on Grand for the unlawful harrassment, slander and discrimination I have endured through out my employment here. I have been repeatedly violated of my state and federal rights and this evening has taken its final toll. I am filing tomorrow morning with the EEOC and will be providing all the documents and evidence i have collected from the day i started here. I tried to discuss this matter repeatedly with my superiors with no prevail so this is all i have left to do. Please be aware that this is a formal notice and it is in violation of federal law to terminate me for retaliating against me for advising you of my complaint.
>
> Sincerely,
> Vincent Saitta
> 08/19/2008
> 9:02 pm

(Pl's 56.1, Ex. Q, at 7) (mistakes in original.) Perrin, the owner of the dealership, testified that he found out about the 70-cents incident within a week when Ridings told him by phone that he had caught Saitta stealing. (Pl's 56.1, Ex. B, at 28-29.) Perrin testified that he told Ridings, "Well, then you know what to do," meaning that Ridings should terminate Saitta. (*Id.* at 29-30, 35.) Ridings does not remember when or if he told Perrin about the 70-cents incident, and he testified that Perrin did not tell him to terminate Saitta until several days later. (Pl's 56.1, Ex. C, at 77.) Perrin, says he assumed that Ridings would fire Saitta the day after their first conversation, but during another phone conversation some time later, Ridings told him that he had not fired Saitta because he was concerned about Saitta's threatened legal action. (Pl's 56.1, Ex. B, at 36.)

On August 30, Perrin was at the dealership and had a conversation with Saitta. (Pl's 56.1 ¶ 50.) Saitta apologized to Perrin and tried to explain the situation. (*Id.*) Specifically, Saitta explained, he felt bad about threatening to sue Perrin because it was Saitta's coworkers, not Perrin, who were guilty of harassing conduct. (Pl's 56.1, Ex. A, at 282-83.) Perrin, who was admittedly aware of Saitta's threatened lawsuit, responded, "If you're going to shoot the king, you better kill

the king."[1]  (Pl's 56.1 ¶ 50.)  Defendant does not dispute that Perrin made this statement.  (Def's Resp. to Pl's 56.1 ¶ 50.)

According to Perrin, on September 2 or 3, he talked to Ridings by phone in anticipation of another visit to the dealership.  (Pl's 56.1, Ex. B, at 41.)  Perrin testified that he instructed Ridings to fire Saitta and warned that if Ridings did not do so, Perrin would do it himself.  (*Id.*)  Ridings recalls that Perrin told him to terminate Saitta on September 3 or 4, and that it was the first time Perrin had so instructed him.  (Pl's 56.1, Ex. C, at 77.)  On September 3, Saitta's lawyer informed Defendant's lawyer that she would file Saitta's lawsuit that day.  (Pl's 56.1 ¶ 52.)  Ridings terminated Saitta a day later, on September 4, 2008.  (*Id.* ¶ 51-52; Def's 56.1 ¶ 79.)  Perrin and Ridings both testified that the only reason for the termination was the 70-cents incident.  (Pl's 56.1 ¶ 53.)  Saitta asserts, however, that at the time that Ridings terminated him, Ridings said that he was being terminated because of the lawsuit.  (*Id.*)  Ridings denies having made any such statement.  (Pl's 56.1, Ex. C, at 79-80.)

## **ANALYSIS**

### A. **Summary Judgment Standard**

The court will grant summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party."  *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

---

[1] A variant of this maxim—"When you strike at a king, you must kill him"—is often attributed to Ralph Waldo Emerson.  RALPH KEYES, THE QUOTE VERIFIER at 56 (2006).  The sentiment surely predates him, though, as evidenced by an English proverb from the seventeenth century: "Whosoever draws his sword against the prince must throw the scabbard away."  *Id.*

5

**B.     Retaliation**

Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII.  42 U.S.C. § 2000e-3(a).  Employees are also protected from unlawful retaliation by 42 U.S.C. § 1981. *CBOCS West, Inc. v. Humphries*, ___ U.S. ___, 128 S. Ct. 1951, 1954-55 (2008).  To succeed on a claim under either statute, a plaintiff must prove the same elements. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).  To do so, a plaintiff can proceed under either the direct or the indirect method of proof, either proving a direct causal link between protected activity and a materially adverse action by the employer, or by proving that his job performance was satisfactory but he was nevertheless treated less favorably than similarly situated co-workers who had not engaged in protected activity. *Id.*  Even where a plaintiff can prove a prima facie case of unlawful retaliation, he cannot succeed on the ultimate claim unless he successfully casts doubt on the employer's nonretaliatory explanation. *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 n.6 (7th Cir. 2008).

Saitta proceeds here under the direct method, arguing that he has presented a prima facie case by showing that "(1) he engaged in a statutorily protected activity; (2) an adverse action was taken against him by his employer; and (3) there is a causal connection between the two." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 641 (7th Cir. 2009).  The parties do not dispute that Saitta's e-mail and filing of a lawsuit constitute statutorily protected activities or that his termination was a materially adverse action.  The only dispute with respect to the prima facie case is whether the evidence is sufficient to demonstrate a causal connection between the two.  As evidence of the necessary causal connection, Saitta points primarily to the suspicious timing surrounding his termination. (Pl's Br. at 17-19.)  Suspicious timing alone is sufficient to survive summary judgment only in the most extreme cases. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).

In *Casna*, the plaintiff had satisfied the causation element of the prima facie case where the decision-maker recommended terminating the plaintiff on the same day she engaged in protected activity. *Id.* Saitta argues that his evidence is similarly powerful because he was terminated just one day after he filed his lawsuit. (Pl's Br. at 19.) Defendant contends that Plaintiff's threat to sue actually *delayed* his termination because Defendant was concerned about a suit for retaliation. (Def's Reply Br. at 3-4.) Just how suspicious the timing was is further complicated by questions of when Perrin and Ridings learned about the lawsuit and which one made the ultimate decision to terminate Saitta.

The court need not decide whether the timing alone is sufficient to make a prima facie case because Saitta has also presented other evidence of unlawful retaliation—Perrin's statement that "if you're going to shoot the king, you better kill the king."[2] The meaning of this maxim, in Saitta's view, is clear: if you fail in your threat against someone strong, you will be punished for it; that is, the stronger party will *retaliate* against you. Defendant would read Perrin's statement to mean, "[I]f you are going to bring threats against the company, you had better make sure you are right." (Def's Reply Br. at 9.) The court need not decide whether that interpretation is as innocent as Defendant believes because, at the summary judgment stage, Defendant's interpretation does not govern. Because a jury could understand Perrin to have been telling Saitta that his protected activity could have negative repercussions of his employer's making and because it was soon followed by Saitta's termination, the statement is strong evidence of unlawful retaliation. *See Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) (warning by employee's supervisor that going over his head with a discrimination complaint was ill-advised constituted circumstantial evidence of retaliation).

---

[2] Saitta testified that after Ridings terminated him, Ridings admitted that he was being terminated because of the lawsuit. (Pl's 56.1, Ex. A, at 420.) Ridings disputes Saitta's account; he testified that he said nothing about Saitta's lawsuit during the conversation in which he told Saitta he was fired. (Pl's 56.1, Ex. C, at 79-80.) On summary judgment, the court assumes that Saitta's account is true, but curiously, Saitta does not mention the admission in his brief in opposition to Defendant's motion for summary judgment.

Combined with the short period of time between Saitta's protected activity and his termination, it is enough to satisfy the third element of the prima facie case.

Even though Saitta has presented evidence from which a jury could find that he has made a prima facie case of retaliation, summary judgment must still be granted to Defendant if Saitta cannot rebut its evidence that it would have terminated him regardless of his protected conduct. *Argyropoulos*, 539 F.3d at 736 n.6. Defendant argues that it had a legitimate and independent justification for terminating Saitta, the theft of 70 cents. (Def's Br. at 15.) A termination for stealing 70 cents is a bit hard to swallow, but more importantly, the facts surrounding the incident are disputed. A jury could find that Ridings and Abdi reasonably believed that Saitta was stealing a customer's property, but a jury could also find that Ridings and Abdi did not honestly suspect Saitta of theft and meant only to harass him. Accordingly, summary judgment is denied on Saitta's retaliation claim.

Before continuing, the court notes Defendant's argument that Saitta manufactured his retaliation claim because he knew that he would be terminated after the 70-cents incident. As the Seventh Circuit has put it, "[A] plaintiff cannot guarantee himself a *prima facie* case simply by threatening a lawsuit when it appears clear that he is about to be fired." *Reed v. Innovative Health & Fitness Ltd.*, 259 F. App'x 875, 878 (7th Cir. 2008). The court shares Defendant's concern, but, as explained, whether it was clear that Saitta was about to be fired is a question for the jury.

**C.     Hostile Work Environment**

Saitta's remaining claims, again under both Title VII and 42 U.S.C. § 1981, are that he was subjected to a hostile work environment. To survive summary judgment on his hostile work environment claims, Saitta must present evidence showing that "(1) he was subjected to unwelcome harassment, (2) the harassment was based on his national origin, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile

8

and abusive working environment, and (4) there is a basis for employer liability." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir.2008) (internal quotation marks omitted). Because Saitta bears the burden of proof on this issue, his claims can survive summary judgment only if he affirmatively demonstrates that there is a genuine issue of material fact. *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006). The two paragraphs devoted to arguing the issue in Saitta's brief fail to do so. (Pl's Br. at 24.)

Saitta has not produced sufficient evidence on the third prong, which has both an objective and a subjective component. *Lapka v. Chertoff,* 517 F.3d 974, 983 (7th Cir. 2008). To determine whether alleged harassment is objectively offensive, the court considers several factors including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Saitta would have the court consider more alleged harassment than just the name-calling and insults, but he fails to explain the connection between his national origin and that other conduct, which includes the placement of sexually explicit materials on his desk or being called to a lot where he was not in fact needed. Thus, the court considers only the name-calling and insults. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863-64 (7th Cir. 2005). Although Saitta alleges that he was harassed on a daily basis, he does not allege that the harassment went beyond the sort of crass locker-room talk common among "coarse or boorish workers" at certain businesses. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007). Thus, although the comments may have been offensive, a jury could not find that they were sufficiently threatening or humiliating to create a hostile work environment. *Moser*, 406 F.3d at 903 (handful of comments made "in the context of headless jokes, as opposed to serious or threatening comments, simply does not rise to the level of harassment our court has held actionable.") Moreover, although Saitta's previously high sales figures declined in

early 2008, he attributed the decline not to his employment conditions, but to the bad economic climate. (Def's 56.1 ¶ 15.) Thus, Saitta's evidence is not sufficient to show an objectively hostile work environment.

Saitta's testimony also suggests that he did not subjectively perceive the work environment at Honda on Grand to be hostile. *Moser*, 406 F.3d at 903 n.3. First, he testified that he liked or had a good relationship with some of the managers that he alleged had harassed him. (Pl's Resp. to Def's 56.1 ¶ 12.) Saitta also testified that he had hoped to spend the rest of his career working for Defendant. (*Id.* ¶ 58.) Accordingly, the court grants Defendant's motion for summary judgment on Saitta's hostile work environment claims.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment [82] is granted with respect to Saitta's hostile work environment claims (Claims One and Two) and denied with respect to Saitta's retaliation claims (Claims Three and Four).

ENTER:

Dated: October 23, 2009

_____
REBECCA R. PALLMEYER
United States District Judge